# In the United States Court of Federal Claims

No. 19-1766C
Filed: May 28, 2021
FOR PUBLICATION

---

**AMIR HEKMATI,**

                         *Plaintiff,*

**v.**

**UNITED STATES,**

                         *Defendant.*

---

*Emily P. Grim*, Gilbert LLP, Washington, D.C., for the plaintiff.

*Shari A. Rose*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for the defendant.

## MEMORANDUM OPINION

***HERTLING*, Judge**

      The United States Victims of State Sponsored Terrorism Fund ("Fund") compensates eligible individuals injured in acts of state-sponsored terrorism.[1]  The Fund is administered by the Department of Justice ("DOJ"), through a special master.  The plaintiff, Amir Hekmati, is a United States citizen.  During a visit to his grandmother in Iran, he was arrested and imprisoned by the Iranian government.  After being released, he sued the Islamic Republic of Iran in federal district court and was awarded a judgment.  The plaintiff then applied for compensation from the Fund.  The special master initially determined that the plaintiff's claim met the criteria to be eligible for payment from the Fund, but the plaintiff was subsequently notified that the award determination would be reconsidered.  The plaintiff then filed this suit, arguing that the reconsideration of the award determination is unlawful.  After the plaintiff filed his complaint, the special master, upon reconsideration, denied the plaintiff's eligibility for compensation from the Fund.

      The defendant, the United States, acting through the DOJ, has moved to dismiss the case for lack of subject-matter jurisdiction under Rule 12(b)(1) of the Rules of the Court of Federal

---

[1] Congress did not employ a hyphen in "State Sponsored" in the statute that created the Fund. References to the Fund itself or the legislation creating it do not use a hyphen.  For grammatical correctness, the Court's own references to state-sponsored terrorism use a hyphen.

Claims ("RCFC") or, in the alternative, for failure to state a claim upon which relief can be granted under RCFC 12(b)(6).  Alternatively, the defendant has moved for summary judgment. The plaintiff has cross-moved for summary judgment.

The plaintiff cannot invoke the Tucker Act's waiver of sovereign immunity because the Fund's authorizing statute provides the exclusive remedial scheme and prohibits judicial review of the special master's decisions regarding compensation from the Fund.  Accordingly, the Court does not have jurisdiction to award damages resulting from failed payments allegedly owed to the plaintiff from the Fund.  Without jurisdiction over the plaintiff's claim for damages, the Court also lacks jurisdiction over the plaintiff's claims for non-monetary relief.  Lacking subject-matter jurisdiction over the plaintiff's claims, the Court grants the defendant's motion to dismiss.

## I.    BACKGROUND

### A.    Legal Framework

The Fund was established in 2015 by the Justice for United States Victims of State Sponsored Terrorism Act, codified at 34 U.S.C. § 20144 (the "USVSST Act").[2]  The Fund's purpose, as explained in a Federal Register notice, is "to provide compensation to certain eligible individuals who were injured in acts of state sponsored terrorism."  Justice for United States Victims of State Sponsored Terrorism Act Notice ("Fund Notice"), 81 Fed. Reg. 45,535, 45,535 (July 14, 2016).

Congress initially appropriated $1.025 billion to the Fund for fiscal year 2017, to remain available until expended.  34 U.S.C. § 20144(e)(5).  There are several sources of ongoing funding, including certain forfeited funds and Iranian assets and the proceeds from the sale of certain property forfeited to the United States in civil and criminal proceedings related to state-sponsored terrorism.  *Id.* § 20144(e)(2).

A special master, appointed by the Attorney General, administers the Fund.  *Id.* § 20144(b)(1)(A).  Each time the amount of the Fund exceeds $100 million, "the Attorney

---

[2] The Justice for United States Victims of State Sponsored Terrorism Act was previously codified at 42 U.S.C. § 10609 (2015).  The statute was amended, and the locus of its codification was changed by the United States Victims of State Sponsored Terrorism Fund Clarification Act, Pub. L. No. 116-69, § 1701, 133 Stat. 1134, 1140-43 (2019).  The Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, § 1705, 134 Stat. 1182, 3293-94 (2020), extended the term of the Fund from 2030 to 2039.

General shall appoint or reappoint a Special Master . . . ."  *Id.* § 20144(b)(1)(A)(ii).  Otherwise, appointment of a special master is discretionary.  *Id.*

The special master determines whether a claim is an "eligible claim" for compensation.  *Id.* § 20144(c)(1).  To qualify as an eligible claim, the special master must determine that:

- the claimant is a U.S. person;
- as relevant to the plaintiff's claim, a U.S. district court has awarded the claimant compensatory damages in a final judgment "against a foreign state that was designated as a sponsor of terrorism at the time the acts [arising from international terrorism] . . . occurred"; and
- the claimant meets the deadline for applying.

*See id.* § 20144(c)(1)-(3).  Claimants who are criminally culpable for an act of international terrorism are excluded from receiving compensation.  *Id.* § 20144(h).

After determining that a claim meets the eligibility requirements, the special master administers payment: "The Special Master shall order payment from the Fund for each eligible claim of a United States person to that person . . . ."  *Id.* § 20144(d)(1).  Setting a payment cap, the statute provides that the special master shall treat eligible claims that exceed $20 million as if they were for $20 million.  *Id.* § 20144(d)(3)(A)(ii)(I).  The special master pays eligible claims annually on a pro rata basis, dividing available funds among eligible claimants and disbursing them in separate rounds.  *See id.* § 20144(d)(3)(A)(i).  Payments are contingent on the availability of funds.  *See id.* § 20144(d)(4)(A).

Within 60 days of initial appointment, the special master was required by the USVSST Act to publish "a notice specifying the procedures necessary for United States persons to apply and establish eligibility for payment, including procedures by which eligible United States persons may apply by and through their attorney."  *Id.* § 20144(b)(2)(A).  On July 14, 2016, the Fund's first special master, Kenneth Feinberg, published the required notice in the Federal Register.  *See Fund Notice*, 81 Fed. Reg. 45,535.

The notice provides that the claimant has the burden of establishing eligibility for payment from the Fund.  *Id.* at 45,537.  The claimant must certify the veracity of the application and supporting documents:

> The [claimant] certifies, under oath, subject to penalty of perjury or in a manner that meets the requirements of 28 U.S.C. [§] 1746, that the information provided in the application and any documents submitted in support of the claim are true and accurate to the best of the [claimant's] knowledge, and the [claimant] agrees that any payment made by the Fund is expressly conditioned upon the

truthfulness and accuracy of the information and documentation submitted in support of the claim.

*Id.* at 45,539.  Using the same language as the notice, the Fund application itself requires that the claimant certify the veracity of the claim and acknowledge that truthfulness is a condition for payment from the fund.  (ECF 31-5, Pl.'s Ex. 5 at 15.)

Under the terms of the USVSST Act, the special master's decisions are final, subject only to a review hearing requested by a claimant whose claim has been denied in whole or in part:

(3) Decisions of the Special Master

All decisions made by the Special Master with regard to compensation from the Fund shall be--

(A) in writing and provided to the Attorney General, each claimant and, if applicable, the attorney for each claimant; and

(B) final and, except as provided in paragraph (4), not subject to administrative or judicial review.

(4) Review hearing

(A) Not later than 30 days after receipt of a written decision by the Special Master, a claimant whose claim is denied in whole or in part by the Special Master may request a hearing before the Special Master pursuant to procedures established by the Special Master.

(B) Not later than 90 days after any such hearing, the Special Master shall issue a final written decision affirming or amending the original decision.  The written decision is final and nonreviewable.

34 U.S.C. § 20144(b)(3)-(4).

**B.     Facts[3]**

**1.     The Plaintiff's Judgment Against Iran**

The plaintiff, a U.S. citizen, served in the U.S. Marine Corps from 2001 to 2005 as an infantry rifleman and translator.  (ECF 31, ¶¶ 15, 17.)  Following an honorable discharge, the plaintiff worked for military contractors from 2005 to 2011.  (*Id.* ¶ 18.)  In 2011, the plaintiff started a new job with a government contractor doing intelligence work in Afghanistan.  (*Id.* ¶ 22.)

---

[3] In considering the defendant's motion to dismiss, the facts as alleged in the plaintiff's amended complaint (ECF 31) are assumed to be true.  This summary of the facts does not constitute findings of fact but is simply a recitation of the plaintiff's allegations.

4

After quitting his new job within a couple of months, the plaintiff travelled from Afghanistan to Iran at his mother's urging. (*Id.* ¶¶ 29-30.) His mother had been "encouraging him and his siblings to travel to visit their grandmother, who was suffering from health problems." (*Id.* ¶ 21.) During that trip, the plaintiff was arrested and imprisoned by Iranian officials, who accused him of spying. (*Id.* ¶ 33.)

From August 2011 to January 2016, the plaintiff was imprisoned in Iran. (*Id.* ¶¶ 33-42.) The plaintiff alleges that he was physically and psychologically tortured while imprisoned. (*Id.* ¶¶ 34-40.) In January 2016, he "was released from prison as part of a prisoner trade between Iran and the United States, coextensive with the Iran nuclear deal." (*Id.* ¶ 42.)

In May 2016, the plaintiff sued the Islamic Republic of Iran in the U.S. District Court for the District of Columbia. (*Id.* ¶ 48.) He alleged "that his detention and treatment by the Iranian government constituted torture and hostage-taking under the Foreign Sovereign Immunities Act." (*Id.*) In support of his motion for a default judgment, the plaintiff submitted a declaration under penalty of perjury. (*Id.*) In that declaration, the plaintiff explained his reason for visiting Iran:

> My parents had been encouraging me for many years to visit my relatives [in Iran] and to see the country of my parents' birth. My mother had been encouraging me in particular over the last few months to visit my grandmother in Iran if I had the chance, as her health had begun deteriorating. Given that I would be starting school and likely would not have time to go to Iran in the foreseeable future, I decided it was an opportune time to make the trip. I flew to Iran via Dubai and planned on staying for a few weeks.

(*Id.* ¶ 49 (quoting Decl. of Amir Hekmati ¶ 25, *Hekmati v. Islamic Republic of Iran*, No. 16-0876 (ESH) (D.D.C., ECF No. 14-1)) (modification in original).)

In granting the plaintiff's motion for a default judgment, the district court found as a fact that "[b]efore returning to the United States, [the plaintiff] decided he would take his first trip to Iran to visit relatives and see the country of his parents' birth." *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 149-50 (D.D.C. 2017). (*See* ECF 31, ¶ 50 (quoting the district court's finding).)

In September 2017, the district court awarded the plaintiff a default judgment against the Islamic Republic of Iran in the amount of $63,496,358, consisting of "(1) $16,020,000 in compensatory damages for pre-release pain and suffering; (2) $10,000,000 in compensatory damages for post-release pain and suffering; (3) $5,728,179 in economic damages; and (4) $31,748,179 in punitive damages." (ECF 36-2, Pl.'s Ex. 1-A at PA36; ECF 31, ¶ 51.)

### 2.      The Plaintiff's Fund Application

On December 6, 2017, the plaintiff, through counsel, filed a claim with the Fund before the September 14, 2018 deadline for the second round of Fund distributions.[4]  (ECF 31, ¶ 64.) The plaintiff completed the "application and provided documentation demonstrating that he was a United States citizen with an eligible District Court judgment against Iran, a country that was a state sponsor of terrorism for the duration of his confinement and torture." (*Id.* ¶ 65.)  As the application requires, the plaintiff certified under oath and subject to penalty of perjury "'that the information provided in the Application Form and any documents submitted in support of the claim are true and accurate to the best of my knowledge,'" and he acknowledged "'that any payment made by the Fund is expressly conditioned upon the truthfulness and accuracy of the information and documentation submitted in support of the claim.'" (*Id.* (quoting ECF 31-5, Pl.'s Ex. 5 at 15 (U.S. Victims of State Sponsored Terrorism Fund Application Form)).)

In a letter dated December 28, 2017, Special Master Feinberg notified the plaintiff that his claim had been determined to be eligible for payment from the Fund.  (ECF 31-6, Pl.'s Ex. 6.)  Because the Fund does not compensate for punitive damages, the amount of the plaintiff's eligible claim was $31,748,179.  (ECF 31, ¶ 66.)  The plaintiff's claim was further limited by the statutory cap of $20 million on payments from the Fund to individual claimants. *See* 34 U.S.C. § 20144(d)(3)(A)(ii)(I).

In all bold typeface, the special master's letter provided the following conditions on payment:

> Although the USVSST Fund has determined that your claim is eligible, please note that there is no guarantee that you will receive the total eligible claim amount.  Rather, the amount of your first payment will be calculated <u>after</u> the USVSST Fund determines the amount of funds available from which to pay claims and <u>after</u> any statutory limitations are applied to the total eligible claim amount shown above [$31,748,179].  You will be notified about the exact amount of your first payment after the Special Master authorizes the next distribution in January 2019.

(ECF 31-6, Pl.'s Ex. 6 (emphasis in original) (bold omitted).)  The Fund calculates payments for individual claimants after determining the amount of funds available.  34 U.S.C. § 20144(d)(3).

In a letter dated December 13, 2018, Special Master Feinberg notified the plaintiff that he had reviewed and approved the plaintiff's claim for compensation, noting the amount that the

---

[4] The special master authorized the first round of payments in December 2016 for eligible claimants who had submitted applications between July 14 and December 1, 2016.  (ECF 31, ¶ 61.)  The plaintiff had not been awarded a judgment against Iran at that time, so he had not applied for the first-round payments.

plaintiff would be paid in the second-round distribution: "The allocated payment amount for this distribution is $839,100.85." (ECF 31-7, Pl.'s Ex. 7.) The only condition on this payment was that the plaintiff had to complete the "Direct Deposit - ACH Payment Form" to receive payment. (*Id.*) The plaintiff had already provided the Fund with updated address and deposit information in October 2018. (ECF 31, ¶ 67.)

On January 2, 2019, the Fund started issuing second-round payments. (*Id.* ¶ 62.) Because the Fund had not paid the plaintiff by April 2019, the plaintiff's counsel began contacting the Fund. From April 2019 through October 2019, the plaintiff's counsel called the Fund six times, emailed the Fund five times, emailed the DOJ twice, and sent one letter to the DOJ and two letters to Deborah L. Connor, the interim special master appointed after Special Master Feinberg had retired. (*Id.* ¶ 71; *see also id.*, Pl.'s Exs. 8-13.) These inquiries were met with no response, with responses that payments were still being made, or with responses that no information was available.[5] (ECF 31, ¶ 72.)

In a final letter to Special Master Connor on October 11, 2019, the plaintiff's counsel notified the special master "that if [the plaintiff] does not receive payment from the USVSST Fund in the next fifteen (15) days, our firm will file suit against both you and the [DOJ]." (ECF 31-13, Pl.'s Ex. 13.) Thirteen days later, on October 24, 2019, Special Master Connor notified the plaintiff via letter "that the Department intends to seek reconsideration of the prior eligibility determination and approval of [the plaintiff's] claim dated December 13, 2018, and therefore has suspended any further action on payment to [the plaintiff] from the . . . Fund." (ECF 31-14, Pl.'s Ex. 14.) The letter noted that the DOJ would be rehiring Special Master Feinberg, "on a limited basis," to "examine whether the conditions for compensation and payment under the applicable statute and procedures have been satisfied." (*Id.*)

## C.   Procedural History

On November 18, 2019, the plaintiff filed his complaint in this court. (ECF 1, *amended by* ECF 31.) The plaintiff alleges that the special master's reconsideration "has no factual or legal basis and violates the terms of the Fund's authorizing statute, which states that all eligibility determinations are final." (ECF 31, ¶ 4.) In his amended complaint the plaintiff seeks the following damages:

> (i) payment of the $2,006,800 currently owed to [the plaintiff] from
> the Fund's second- and third-round distributions, (ii) payment of all
> future amounts due to [the plaintiff] under his award from the Fund,

---

[5] Representative Dan Kildee and Senator Debbie Stabenow, both from the plaintiff's home state of Michigan, also inquired about the status of the payment to the plaintiff from the Fund. (ECF 31, ¶ 73.) Senator Stabenow did not receive a response, and Rep. Kildee received a response that payments were still being made. (*Id.*)

up to $20,000,000, and (iii) such other appropriate damages and relief permitted by law, all in an amount to be determined at trial.

(*Id.* ¶ 113.)[6]  In addition to these damages, the plaintiff seeks "an order directing the correction of any and all applicable records so that [the plaintiff's] claim is deemed eligible for payment in all future rounds of distributions by the Fund." (*Id.* ¶ 114.)  The plaintiff also seeks fees and costs. (*Id.* ¶ 115.)[7]

The Court scheduled the filing of dispositive motions for May 2019.  Shortly before the parties' cross-motions were due, the parties moved to amend the schedule to delay the filing of dispositive motions until after the special master had resolved his reconsideration of the plaintiff's claim. (ECF 13.)  The Court granted the motion and stayed the case pending a resolution of the special master's reconsideration. (ECF 14.)

On January 15, 2020, Special Master Feinberg, who was reappointed for the limited purpose of reconsidering the plaintiff's claim, notified the plaintiff that, upon reconsideration, he had determined that the plaintiff is not eligible for compensation from the Fund. (ECF 31-15, Pl.'s Ex. 15.)  The DOJ had provided the special master with materials not before him at the time of his earlier eligibility and payment determinations. (*Id.*)  Quoting the notice published in the Federal Register, the special master explained that payments from the Fund are "'expressly conditioned upon the truthfulness and accuracy of the information and documentation submitted in support of the claim.'" (*Id.* (quoting Fund Notice, 81 Fed. Reg. at 45,539).)  Based on the new information, the special master determined that the plaintiff had violated this condition:

> I am persuaded that the [DOJ's] materials demonstrate that [the plaintiff's] application and accompanying documents contained material omissions and false statements; in particular, the attached materials support the conclusion that the primary purpose of [the plaintiff's] trip to Iran was to sell classified U.S. national security information to the government in Iran.  This conflicts with [the plaintiff's] declaration filed in connection with the judgment he obtained in the U.S. District Court for the District of Columbia that the primary purpose of his trip to Iran was to visit family for personal reasons.

(*Id.*)  The special master concluded that the plaintiff had violated the Fund's processes and procedures, thereby making him ineligible for payment from the Fund. (*Id.*)

---

[6] The special master authorized a third round of payments in May 2020, while this case was ongoing. (*See* ECF 31, ¶ 63 (noting that the Fund continues to issue third-round payments on a rolling basis).)

[7] The plaintiff does not assert a constitutional claim, including a claim based on the fifth amendment's takings clause.

In February 2020, the plaintiff, through counsel, invoked his right to a review hearing under 34 U.S.C. § 20144(b)(4). (ECF 31-16, Pl.'s Ex. 16.) The plaintiff notified the special master that he disagreed with the reconsideration decision on both legal and factual grounds. (*Id.*) Although the plaintiff maintained that the special master's reconsideration was not lawful, he explained that he wanted to provide his own views and supporting materials to the special master. (*Id.*) In March and April 2020, the plaintiff provided written evidence and oral testimony to rebut the DOJ's materials. (ECF 31, ¶ 81.) Unpersuaded, in December 2020 the special master affirmed his prior reconsideration decision denying the plaintiff's application for payment from the Fund. (ECF 31-18, Pl.'s Ex. 18.)

Following the special master's final decision on reconsideration, the Court vacated the stay and set a new schedule for the filing and briefing of dispositive motions. (ECF 29 & 30.) The defendant has moved to dismiss or, in the alternative, for summary judgment. (ECF 34.) The plaintiff has cross-moved for summary judgment. (ECF 36.) The matter has been fully briefed, and the Court heard oral argument on May 11, 2021.

## II.    STANDARD OF REVIEW

The defendant has moved to dismiss the plaintiff's complaint for lack of subject-matter jurisdiction under RCFC 12(b)(1). The issue of a court's subject-matter jurisdiction goes to the ability of the court to entertain a claim and thus presents a "threshold matter" that must be addressed before considering the merits of a plaintiff's complaint. *E.g., Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998).

To determine whether it has jurisdiction, a "court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011). The plaintiff has the burden of establishing jurisdiction by a preponderance of the evidence. *Id.* When a plaintiff's jurisdictional facts are challenged, only those factual allegations that the government does not controvert are accepted as true. *Shoshone Indian Tribe of Wind River Rsrv. v. United States*, 672 F.3d 1021, 1030 (Fed. Cir. 2012). The court is not "'restricted to the face of the pleadings'" in resolving disputed jurisdictional facts. *Id.* (quoting *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1584 (Fed. Cir. 1993), *cert. denied*, 512 U.S. 1235 (1994)). The court may review evidence outside the pleadings. *Id.*

If the Court finds that it lacks subject-matter jurisdiction over a plaintiff's claim, RCFC 12(h)(3) requires the Court to dismiss the claim.

## III.    JURISDICTION

The defendant argues that the USVSST Act provides its own remedial scheme, displacing potential jurisdiction under the Tucker Act. (ECF 44 at 3-5.) In addition, the defendant argues that the USVSST Act expressly prohibits judicial review of the special master's decisions regarding compensation. (ECF 34 at 17-18.) The defendant argues that these two factors, operating in tandem, bar the Court from exercising jurisdiction over the complaint. Despite the plaintiff's contention that he is not seeking review of the special master's decision, the defendant

argues that the plaintiff is, in essence, challenging the special master's decision as to his eligibility to receive compensation from the Fund.  (*Id.* at 18; ECF 40 at 3-4.)  According to the defendant, Congress provided a specific remedy for disappointed claimants under the USVSST Act, barring all other review.  (ECF 44 at 3-5.)

The plaintiff admits that the USVSST Act contains "a broad prohibition on judicial and administrative review of the Special Master's compensation decisions," but he argues that "nowhere does the Act preclude judicial review of the Fund's failure to carry out its payment obligations once a compensation decision is rendered, or of any other misconduct by the Government in administering the Fund." (ECF 41 at 8.)  The plaintiff points out that he filed this case before the special master issued his reconsideration decision denying the plaintiff's eligibility.  (*Id.*)  Rather than seeking review of the special master's decision on reconsideration, the plaintiff argues that he seeks damages based on the special master's allegedly unlawful decision to reconsider his eligibility.  (*Id.*)

Despite the plaintiff's effort to circumvent the USVSST Act's prohibition on judicial review of the special master's decisions, his claim for damages necessarily requires the Court to review the special master's compensation decision.  The USVSST Act expressly prohibits such review.  Even if the Court accepts the plaintiff's characterization of his claim as arising from the special master's decision to reconsider his claim and not from the denial of the claim itself, the plaintiff's claim that the special master acted in violation of the statute is not a claim cognizable under the Tucker Act.  The relief for that claim is an injunction or a declaratory judgment, the types of equitable relief that are, in most cases, beyond the authority of the Court of Federal Claims, but may be within the jurisdiction of a district court under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06.

The Court first considers the plaintiff's claim for damages and then turns to the plaintiff's claims for non-monetary relief.

## A.    Award of Damages

The Tucker Act, 28 U.S.C. § 1491(a), contains a clear statement by Congress waiving sovereign immunity and establishes this court's jurisdiction.  *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003).  The Tucker Act gives this court limited jurisdiction over claims for damages against the United States:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1).

The Tucker Act itself does not "create[ ] a substantive right enforceable against the Government by a claim for money damages." *White Mountain Apache Tribe*, 537 U.S. at 472. Instead, the Tucker Act limits this court's jurisdiction to causes of action based on separate money-mandating statutes and regulations. *Metz v. United States*, 466 F.3d 991, 995-98 (Fed. Cir. 2006). A statute is money-mandating when it is "reasonably amenable to the reading that it mandates a right of recovery in damages. . . . [A] fair inference will do." *White Mountain Apache Tribe*, 537 U.S. at 473. This standard is referred to as the "fair interpretation" rule. *See id.* at 472.

### 1.    Supreme Court Precedents

A money-mandating statute does not automatically establish this court's jurisdiction. The Supreme Court has held that even when a statute imposes monetary liability on the United States, the Tucker Act is displaced when that statute provides its own remedial scheme. "In that event, the specific remedial scheme establishes the exclusive framework for the liability Congress created under the statute." *United States v. Bormes*, 568 U.S. 6, 12 (2012). As the Court explained, "the Tucker Act cannot be superimposed on an existing remedial scheme. . . . [A]ny attempt to append a Tucker Act remedy to [a] statute's existing remedial scheme interferes with its intended scope of liability." *Id.* at 16.

Surveying its precedents in *Bormes*, the Supreme Court noted that its "recent cases have consistently held that statutory schemes with their own remedial framework exclude alternative relief under the general terms of the Tucker Act." *Id.* at 13 (citing *Hinck v. United States*, 550 U.S. 501 (2007); *United States v. Fausto*, 484 U.S. 439 (1988); *United States v. Erika, Inc.*, 456 U.S. 201 (1982)).

In *Erika* and *Fausto*, for example, the Supreme Court held that the statutes at issue in those cases precluded judicial review of claims arising outside the terms of the statutory remedial schemes.

In the context of the Medicare statute's "precisely drawn provisions," the Court in *Erika* held that the statute, while providing judicial review for awards under Part A, "fails to authorize further review for determinations of the amount of Part B awards," providing "persuasive evidence that Congress deliberately intended to foreclose further review of such claims." 456 U.S. at 207-08.

Likewise, in *Fausto*, the Court held that the Civil Service Reform Act's "deliberate exclusion of employees in respondent's service category from the provisions establishing administrative and judicial review for personnel action of the sort at issue here prevents respondent from seeking review in the Claims Court under the Back Pay Act." 484 U.S. at 455. In both *Erika* and *Fausto*, the statutory remedial scheme provided the exclusive remedial framework, implicitly barring all other review.

In *Hinck,* the Supreme Court relied on "the well-established principle that, in most contexts, 'a precisely drawn, detailed statute pre-empts more general remedies.'" 550 U.S. at 506 (quoting *EC Term of Years Tr. v. United States*, 550 U.S. 429, 433 (2007)) (internal

11

quotation marks omitted). The statute at issue, 26 U.S.C. § 6404(h), designated the Tax Court as the forum for judicial review of certain decisions by the Secretary of the Treasury. The Court was tasked with determining whether judicial review could "also be secured in the district courts and the Court of Federal Claims." *Hinck*, 550 U.S. at 503. In holding that the Tax Court provides the exclusive forum for judicial review, the Court considered the statute's remedial scheme: "It is a 'precisely drawn, detailed statute' that, in a single sentence, provides a forum for adjudication, a limited class of potential plaintiffs, a statute of limitations, a standard of review, and authorization for judicial relief." *Id.* at 506.

These cases provided the background when the Supreme Court faced a similar question in *Bormes*. The Court considered "whether the Little Tucker Act [28 U.S.C. § 1346(a)(2)] waives the sovereign immunity of the United States with respect to damages actions for violations of the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681 *et seq*." *Bormes*, 568 U.S. at 7. The Federal Circuit had applied the "fair interpretation" rule from *White Mountain Apache Tribe* to hold that the Little Tucker Act provided a waiver of sovereign immunity for a suit for violations of the FCRA. *Id.* at 9; *see also White Mountain Apache Tribe*, 537 U.S. at 472-73. In vacating the Federal Circuit's judgment and remanding the case, the Supreme Court held that the "fair interpretation" rule "is not relevant when a 'mandate of compensation' is contained in a statute that provides a detailed judicial remedy against those who are subject to its requirements." *Bormes*, 568 U.S. at 16.

Examining the FCRA in *Bormes*, the Supreme Court held that Congress had created in that statute a detailed remedial scheme. *Id.* at 15. Specifically, "[i]ts provisions 'set out a carefully circumscribed, time-limited, plaintiff-specific' cause of action, and 'also precisely define the appropriate forum.'" *Id.* (quoting *Hinck*, 550 U.S. at 507). The FCRA established a specified limitations period and expressly placed jurisdiction for suits for alleged violations of the FCRA in the federal district courts. *Id.* "Since FCRA is a detailed remedial scheme, only *its own* text can determine whether the damages liability Congress crafted extends to the Federal Government." *Id.* (emphasis in original). In other words, the FCRA's remedial scheme was exclusive; the plaintiff could not invoke the Little Tucker Act's waiver of sovereign immunity.

## 2.    Remedial Scheme of the USVSST Act

The USVSST Act, like the statutes considered in *Erika*, *Fausto*, *Hinck*, and *Bormes*, creates a detailed remedial scheme. The USVSST Act establishes a compensation scheme and directs the appointment of a special master to evaluate all claims and to determine whether the claims satisfy the criteria for eligibility. The USVSST Act provides disappointed claimants a single forum to dispute the special master's decisions regarding compensation from the Fund:

> (A) Not later than 30 days after receipt of a written decision by the Special Master, a claimant whose claim is denied in whole or in part

by the Special Master may request a hearing before the Special Master pursuant to procedures established by the Special Master.

(B) Not later than 90 days after any such hearing, the Special Master shall issue a final written decision affirming or amending the original decision.  The written decision is final and nonreviewable.

34 U.S.C. § 20144(b)(4).

Like the FCRA, the statute at issue in *Bormes*, the USVSST Act sets out a time-limited, plaintiff-specific cause of action and a precisely defined appropriate forum.  *See Bormes*, 568 U.S. at 15.  The USVSST Act specifies a 30-day limitation period after receipt of a special master's written decision.  34 U.S.C. § 20144(b)(4)(A).  It also specifies that a hearing before the special master is the only forum for disappointed claimants.  *Id*. § 20144(b)(3)(B); *see also* Fund Notice, 81 Fed. Reg. at 45,539 (providing procedures for the hearing before the special master).

Because the USVSST Act contains its own detailed remedial scheme for the plaintiff to challenge the special master's decision, the plaintiff cannot invoke the Tucker Act as the basis for damages against the United States.  *See Bormes*, 568 U.S. at 12.  The plaintiff cannot rely on the Tucker Act's "fair interpretation" rule and "leapfrog[ ] the threshold concern that the Tucker Act cannot be superimposed on an existing remedial scheme."  *See id.* at 16.  Congress expressly established an administrative hearing before the special master as the exclusive forum for review.  34 U.S.C. § 20144(b)(3)(B).  Other than seeking review of the initial decision at that hearing, the special master's decisions are "final and . . . *not subject to* administrative or *judicial review*," and the special master's written decisions on review are also "final and nonreviewable."  *Id.* § 20144(b)(3)(B), (b)(4) (emphasis added).

### 3.    Prohibition on Judicial Review

Although there is a presumption in favor of judicial review of administrative action, that presumption "may be overcome by specific language or specific legislative history that is a reliable indicator of congressional intent."  *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984).  The presumption is overcome "whenever the congressional intent to preclude judicial review is 'fairly discernible in the statutory scheme.'"  *Id.* at 351 (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 157 (1970)).

Under the express terms of the statutory scheme here, the special master's decisions are final and not subject to judicial review: "All decisions made by the Special Master with regard to compensation from the Fund shall be . . . final and, except as provided in paragraph (4), not subject to administrative or judicial review."  34 U.S.C. § 20144(b)(3).  As discussed, the only exception, found in paragraph (4), is a review hearing before the special master upon the request of a disappointed claimant within 30 days after receipt of a written decision.  *See id.* § 20144(b)(4).

The plaintiff argues that the USVSST Act does not preclude judicial review of the Fund's failure to carry out its payment obligations after a compensation decision is rendered.  (ECF 41 at 8.)  He denies that he is seeking review of the special master's reconsideration decision

denying him compensation but, rather, argues that he is seeking the money owed to him from the special master's initial determination based on a claim that the special master's decision to reconsider his eligibility violated a money-mandating statute.  (*Id.*)

The defendant argues that the plaintiff "cannot evade the [USVSST] Act's bar against judicial review by characterizing his claim as a violation of th[at] Act . . . ."  (ECF 34 at 18.)  To determine their jurisdiction, courts must look to the true nature of a plaintiff's claim, not a plaintiff's characterization of the claim.  *See Folden v. United States*, 379 F.3d 1344, 1359 n.13 (Fed. Cir. 2004).  The defendant argues that the plaintiff's "claims plainly represent a challenge to the Special Master's decision as to his eligibility to receive compensation from the Fund and the amount of compensation to which [the plaintiff] believes he is due."  (ECF 34 at 18.)

The U.S. District Court for the District of Columbia recently confronted the same jurisdictional question under the USVSST Act: "whether (and to what extent) [34 U.S.C. § 20144] permits judicial review."  *Braun v. United States*, No. CV 20-2613 (JEB), 2021 WL 860251, at *3 (D.D.C. Mar. 8, 2021), *appeal filed*, No. 21-5088 (D.C. Cir. Apr. 29, 2021).  The district court declined to resolve this precise jurisdictional question, instead invoking hypothetical statutory jurisdiction and dismissing the plaintiff's claim for failure to state a claim.[8]  Nevertheless, the analysis in *Braun* is instructive.  *See id.* at *3-4.  The district court considered the question through the lens of the special master's role:

> [The special master] thus serves as an administrative functionary: he determines, for example, whether an individual is statutorily eligible, which of her claims qualify for recovery, whether she has provided adequate supporting documentation, and how much she has already collected from sources other than the Fund, concluding his work by churning the final sum through a mechanical pro rata formula. . . .   The Special Master thus makes consequential determinations under this authority, and such decisions affecting individual compensation are expressly shielded from judicial review.

*Id.* at *3 (citations omitted).  While the USVSST Act bars review of individual determinations, the district court found that the statute may allow "courts to consider programmatic challenges to the Fund's operation."  *Id.* at *4.

### i.      Programmatic Challenge

If "programmatic challenges" to the Fund's operation are not barred by the USVSST Act in district courts, as the court suggested in *Braun*, the plaintiff here nevertheless cannot avoid the

---

[8] Precedent of the U.S. Court of Appeals for the District of Columbia Circuit allows a district court to assume hypothetical statutory jurisdiction and to proceed to the merits.  *Braun*, 2021 WL 860251, at *4 (citing *Am. Hosp. Ass'n v. Azar*, 964 F.3d 1230, 1246 (D.C. Cir. 2020)).

14

proscription on judicial review of the special master's decision in the Court of Federal Claims by asserting a claim challenging the special master's authority to reconsider the plaintiff's eligibility.  The debate between the parties on the merits—whether the special master has authority to reconsider his determinations—could best be described as a programmatic challenge; the plaintiff challenges the operation and management of the Fund.  The problem for the plaintiff is that this court's jurisdiction is more limited than that of the district courts.  Even if such a programmatic challenge could be brought in the district courts under the APA, the USVSST Act's proscription on judicial review precludes the plaintiff from invoking in this court the Tucker Act's waiver of sovereign immunity to obtain review of the special master's legal decisions under the guise of seeking a money judgment.

Because the USVSST Act vests unreviewable authority in the special master to determine eligibility for compensation, the relief the plaintiff is seeking from this Court is effectively an order in the nature of mandamus—he has a legal entitlement to the money from the Fund for which the special master had initially found him eligible.  As an equitable remedy, an order having the effect of a writ of mandamus is beyond this Court's Tucker Act jurisdiction.  *See infra*, III.B.

## ii.    Review of Individual Determination

The plaintiff describes the USVSST Act's requirements in a manner that suggests that a claimant is automatically eligible for compensation if the USVSST Act's three eligibility requirements are met.  (*See* ECF 36 at 20-21 (arguing that it is undisputed that the plaintiff meets each of the conditions under the USVSST Act).)  He explains that he is a U.S. person, that he was awarded compensatory damages against a state sponsor of terrorism, and that he applied within the deadline.  (*Id.*)

Contrary to the plaintiff's assertion, eligibility determinations are not merely ministerial.  The special master administers the Fund, and only the special master has the authority to determine when a claim is an eligible claim.  34 U.S.C. § 20144(b), (c)(1).  A claim is "eligible" if the special master determines that the claimant is a U.S. person; that, as relevant here, a district court awarded the claimant compensatory damages in a final judgment against a state sponsor of terror; and that the claimant meets the deadline for applying.  *Id.* § 20144(c)(1)-(3).  In addition, however, claimants must satisfy other procedural requirements established by the special master.  *See* Fund Notice, 81 Fed. Reg. 45,535.

It is undisputed that the plaintiff is a U.S. citizen, that he was awarded compensatory damages against a state sponsor of terrorism, and that he applied by the statutory deadline.  (ECF 36-1, ¶ 1 (Pl.'s Statement of Undisputed Facts); ECF 40-1, ¶ 1 (Def.'s Resp. to Pl.'s Statement of Undisputed Facts).)  Although the special master initially found the plaintiff's claim eligible for payment from the Fund (ECF 31-6, Pl.'s Ex. 6), the special master has found upon reconsideration that the plaintiff's claim is not eligible for compensation because he did not comply with a procedural requirement established by the special master in the Fund Notice.  (ECF 31-15, Pl.'s Ex. 15).

15

Although the plaintiff characterizes his claim as a challenge to the special master's authority to reconsider a granted claim under the USVSST Act, the plaintiff effectively challenges the special master's individual determination regarding his eligibility for compensation from the Fund.  He seeks damages specifically for payments allegedly owed to him from the Fund, and it was the special master who made the decision not to compensate him from the Fund, finding the plaintiff's claim ineligible for payment.  (ECF 31, ¶ 113; ECF 31-15, Pl.'s Ex. 15.)  Many of the plaintiff's arguments on the merits would require the Court to review the special master's eligibility decision on reconsideration, not the special master's authority to reconsider.  (*See* ECF 36 at 27-29 (arguing that the reconsideration proceedings violate the due process protections established by the USVSST Act); ECF 41 at 16-19 (arguing that the special master's reconsideration was arbitrary, capricious, and an abuse of discretion); ECF 45 at 9-19 (same).)  The Court cannot consider these arguments; review of the special master's eligibility decision is expressly prohibited by the USVSST Act.

In sum, no matter how the plaintiff's claims are construed, either as a programmatic challenge or review of an individual determination, the Court does not have jurisdiction.

### 4.    Conclusion

Under the express terms of the USVSST Act, the Court could not review the special master's determination if he had denied the plaintiff's claim initially.  In that case, the plaintiff's only forum to seek relief would have been the review hearing before the special master.  The plaintiff has not explained how the USVSST Act can be construed to provide jurisdiction over a claim challenging the special master's denial on reconsideration, when no authority for judicial review existed before reconsideration.  The Court does not believe the USVSST Act can sensibly be read in the manner advocated by the plaintiff.  The special master's initial eligibility determination does not establish jurisdiction under the Tucker Act, even if the USVSST Act were money-mandating as the plaintiff argues.  His decision to reconsider, even if contrary to the statute, does not convert the plaintiff's claim to one within this Court's Tucker Act jurisdiction specifically because a decision of the special master to award or deny a claim is not subject to judicial review.

To establish jurisdiction under 28 U.S.C. § 1491(a)(1) and invoke the Tucker Act's waiver of sovereign immunity, the plaintiff must have a claim for damages against the United States.  If the USVSST Act did not by its express terms foreclose judicial review and if the Tucker Act were not displaced under *Bormes*, then this Court might exercise jurisdiction to hear the plaintiff's claim.  *See Fisher v. United States*, 402 F.3d 1167, 1174-75 (Fed. Cir. 2005) (holding that a statute is money-mandating despite the statute providing the Secretary with the authority to determine eligibility); *Doe v. United States*, 100 F.3d 1576, 1580-84 (Fed. Cir. 1996) (holding that a statute is money-mandating despite the statute leaving discretion to a deciding agency official).  The USVSST Act, however, expressly forecloses judicial review and provides a detailed remedial scheme displacing the Tucker Act.  Unlike the statutes at issue in *Fisher* and *Doe*, the USVSST Act forecloses judicial review of the substance of a decision on the merits.  If the Court were to exercise jurisdiction, the plaintiff would be allowed to circumvent Congress's

16

explicit policy decision to prohibit judicial review of the special master's individual award decisions.[9]

The USVSST Act's remedial scheme and its provision barring judicial review, in combination, express Congress's unambiguous intent to proscribe judicial review of the special master's individual compensation determinations. Contrary to those express provisions of the USVSST Act, the substance of the plaintiff's complaint seeks to have this Court review the special master's decision to reopen his claim. Although the plaintiff does assert a legal challenge to that decision, his legal challenge does not establish Tucker Act jurisdiction. In effect, by seeking damages for the special master's decision not to compensate him, he would have this Court review the special master's decision regarding compensation. The language of the USVSST Act forecloses this Court from exercising jurisdiction over that type of claim.

### B.    Non-Monetary Relief

Having found an absence of jurisdiction over the plaintiff's claim for damages, the Court next considers whether the plaintiff's remaining claims for non-monetary relief establish jurisdiction.

Even if the plaintiff could avoid the USVSST Act's proscription on judicial review by asserting his claim as a programmatic challenge, this Court's limited jurisdiction does not, absent jurisdiction over his claim for damages, extend to the plaintiff's claims for non-monetary relief. The plaintiff challenges the special master's decision to reconsider his initial grant of the plaintiff's claim as a violation of the USVSST Act. As relief for this alleged violation, the plaintiff seeks, in part, "an order directing the correction of any and all applicable records so that [the plaintiff's] claim is deemed eligible for payment in all future rounds of distributions by the Fund," and, although characterized as damages in his complaint, "payment of all future amounts due to [the plaintiff] under his award *from the Fund*, up to $20,000,000 . . . ." (ECF 31, ¶¶ 113-14 (emphasis added).) The plaintiff requests, in effect, that the Court order the special master to pay him from the Fund.

The plaintiff argues that the Court has the authority under 28 U.S.C. § 1491(a)(2) to order correction of the plaintiff's records. Section 1491(a)(2) does provide the Court authority to order "correction of applicable records." 28 U.S.C. § 1491(a)(2). The authority conferred by § 1491(a)(2) depends on the existence of jurisdiction to award monetary relief; the authority to direct the correction of records is ancillary to the Court's ability to grant money judgments. *See Voge v. United States*, 844 F.2d 776, 781 (Fed. Cir. 1988) (holding that "section 1491(a) gives

---

[9] The Court is not aware of any case presenting the issue of whether the USVSST Act is money-mandating. Although the Court questions whether it is money-mandating—given its express proscription on judicial review of compensation decisions and the conditions imposed on when and even whether payment of claims from the Fund will be made—the Court does not decide this question. Under *Bormes*, the Tucker Act would be displaced by the USVSST Act's remedial scheme even if it were money-mandating. *See Bormes*, 568 U.S. at 12.

the Claims Court power to order the correction of military records only 'incident of and collateral to' its award of a money judgment" (quoting 28 U.S.C. § 1491(a)(2))); *see also Robinson v. United States*, 135 Fed. Cl. 556, 560 (2017) (applying *Voge* to a plaintiff's request for correction of administrative records).  Without a surviving claim for damages under § 1491(a)(1), the Court has no authority under § 1491(a)(2) to order correction of the plaintiff's records to deem his claim eligible for payment.  If the Court ordered that the plaintiff's records be corrected to deem his claim eligible for payment from the Fund, it would circumvent the proscription on judicial review of the special master's compensation decisions.  The plaintiff's claim seeking correction of his records cannot stand alone without his claim for damages under § 1491(a)(1).  Accordingly, the Court has no authority under § 1491(a)(2) to order correction of the plaintiff's records.

The Court also cannot declare the special master's actions unlawful or order payment to the plaintiff "from the Fund."  (*See* ECF 31, ¶ 113.)  The Court's authority to provide declaratory and injunctive relief is limited to bid-protest actions brought under 28 U.S.C. § 1491(b).  *Lea v. United States*, 592 F. App'x 930, 933 (Fed. Cir. 2014) ("[T]he Tucker Act enables the Court of Federal Claims to grant equitable relief only under limited circumstances . . . .") (citing 28 U.S.C. § 1491(b)(2)).  The plaintiff's claim, if cognizable anywhere, is an APA claim for a statutory violation over which a district court might exercise jurisdiction.

Because the Court lacks jurisdiction over the plaintiff's claim for damages, the Court also lacks jurisdiction over the plaintiff's claims for non-monetary relief.

## IV.    CONCLUSION

Because the USVSST Act provides its own exclusive remedial scheme and proscribes judicial review of the special master's decisions regarding compensation, the Court does not have jurisdiction to award the plaintiff damages resulting from the Fund's failure to pay him. Without a claim for damages, the plaintiff's claims for non-monetary relief are also beyond the Court's jurisdiction.

Because the plaintiff is not the prevailing party, the plaintiff's claim for costs and fees is also dismissed.  *See* 28 U.S.C. § 2412.

The defendant's motion to dismiss under RCFC 12(b)(1) for lack of subject-matter jurisdiction is granted, and the defendant's motion for summary judgment is denied as moot.

The plaintiff's complaint is dismissed for lack of subject-matter jurisdiction pursuant to RCFC 12(h)(3).  The plaintiff's cross-motion for summary judgment is denied.

The Court will issue an order in accordance with this memorandum opinion.

s/ Richard A. Hertling
**Richard A. Hertling**
**Judge**